IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 773 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | February 11, 2019 in the Court of |
| | : | Common Pleas, Butler County, |
| v. | : | Criminal Division at No. CP-10-CR- |
| | : | 0000241-1986 |
| | : | |
| DONALD MITCHELL TEDFORD, | : | SUBMITTED:  December 24, 2019 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE DONOHUE**                                    **DECIDED:  April 22, 2020**

In this capital case, Appellant Donald Mitchell Tedford ("Tedford") was convicted of first-degree murder and rape on February 6, 1987.  He appeals from the order of the lower court dismissing a petition for relief (his second) filed pursuant to the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546 ("PCRA"), on December 2, 2014, as amended by a counseled petition on May 5, 2015, and a supplemental petition filed on June 9, 2015.  In connection with his initial filings, Tedford sought wholesale discovery of the prosecution's entire file, but the PCRA court concluded that the petition (as amended) was not timely filed.  Tedford also appeals the PCRA court's order denying his supplemental PCRA petition, in which he requested discovery, an evidentiary hearing, and/or a new trial based upon the admission of expert testimony presented at trial related to microscopic hair analysis.  The PCRA court concluded that pursuant to

*Commonwealth v. Chmiel*, 173 A.3d 617 (Pa. 2017), it had jurisdiction to consider the merits of his newly discovered facts claims pursuant to Section 9545(b)(1)(ii) of the PCRA. The PCRA court determined, however, that Tedford had not asserted a meritorious claim in accordance with section 9543(a)(2)(vi) of the PCRA. Order of Court Pursuant to Pa.R.A.P. 1925(a), 4/12/2019, at 27. For the reasons set forth hereinbelow, we affirm in all respects.

This matter arises out of the murder and rape of Jeanine Revak, a twenty-two year-old woman pursuing a career in interior design.[1] In October or November 1985, she visited an interior design and decorating store in Cranberry Township, Butler County, known as "The Finishing Touch." There she met Tedford, who as an inmate at the state prison in Greensburg, had been granted work release to secure employment at The Finishing Touch. Tedford interviewed Revak, and although she was not offered employment at that time, she was encouraged by the opportunity and indicated that she would remain in touch.

On Friday, January 10, 1986, Revak did not go to work as a result of a week-long illness. During the day, her husband and friends were unsuccessful in attempts to contact her by phone. At approximately noon, a truck driver stopped at The Finishing Touch with a delivery, but the front door was locked. Tedford soon opened the door, at which time the truck driver saw a young lady in the store (who Tedford later admitted was Revak). When her husband came home from work, Revak was not at the house and there was no note explaining her absence. After other attempts to locate her failed,

---

[1] The facts underlying the convictions are set forth in considerably greater detail in this Court's 1989 opinion affirming Tedford's judgment of sentence on direct appeal. *Commonwealth v. Tedford*, 567 A.2d 610, 611-12 (Pa. 1989).

at about 11:30 p.m. he called The Finishing Touch. Tedford answered, identifying himself as "Don." Revak's husband asked Tedford if he remembered his wife, to which Tedford responded that he did remember her, that she was a very talented girl, but that he had not seen her that day. The next morning, Revak's husband reported her missing to the local police. Later in the day, he found her car parked some distance away in a shopping center parking lot. There was no trace of Revak.

At around 12:30 p.m. that same day, two brothers hunting small game in Washington County found a young woman's body along the shoulder of the road. The rigid state of the body and its discoloration led them to believe that she was dead, so they contacted the authorities. She had on a red jacket, a silk blouse, black slacks, one mesh stocking, gold earrings, a gold necklace, and a wedding band. She was not wearing shoes. When the body was turned over, it was discovered that her slacks were unfastened and the zipper was down. When the investigator checked under her blouse, he found that her bra was pushed up over her breasts. The slacks and jacket were relatively clean except for the presence of some foreign items, which were identified as blood, weeds, and thin, fiber-type material.

From January 10 to January 12, 1986, Tedford had a furlough from prison. He was scheduled to be back in his cell at 9:00 p.m. on Monday, January 13, 1986. He did not report back at that time and was thus considered to be an escapee. On Monday night, January 13, 1986, he was arrested. Pursuant to a search warrant, authorities seized samples of Tedford's head hairs, pubic hairs, blood and saliva.

At trial, the Commonwealth contended that Tedford lured Revak to meet him, took her to The Finishing Touch, and raped her there. Then, fearing that she would report

him for the rape, he strangled her to death and drove her body to the woods in Washington County where he left it for the hunters to find the following day. The Commonwealth relied upon significant circumstantial evidence tying Tedford to the crimes, including that the victim had sperm and seminal fluid in her vagina and on her slacks, which laboratory testing confirmed was consistent with Tedford's blood groupings and genetic characteristics. *Commonwealth v. Tedford*, 960 A.2d 1, 10 (Pa. 2008). The Commonwealth also presented the testimony of two jailhouse informants, who stated that Tedford admitted to them that he forced the victim to have sex with him and then killed her to prevent her from reporting the rape to police. *Id.*

Of significance to this appeal, the Commonwealth also presented the testimony of Pennsylvania State Police Criminalist Scott Ermlick. Ermlick began his testimony by indicating that he found a pubic hair on the victim's underpants and offered the following testimony with regard to this evidence:

Q.   In examining the victim's clothing, did you find any hairs?

A.   I found numerous hairs on her clothing specifically.

Q.   Did you find any pubic hairs?

A.   I found a pubic hair on the victim's underclothing, her underpants.

Q.   Were you able to determine whether or not that came from her body?

A.   It did not match the pubic hair samples that were supplied to me by the coroner.

Q.   Did you receive pubic hair samples from the victim's husband?

A.   I did.

Q. Were you able to compare them and determine whether or not he could have contributed that hair?

A. I did examine them. I did compare them and based on what my examination revealed, they are not from him.

Q. Did you receive pubic hair samples from the defendant?

A. I did.

Q. And were you able to compare those?

A. Yes, I was.

Q. What was the result?

A. That based on my examination I found the hair from the victim's panties to be consistent with the hair from the defendant.

Q. When you say consistent, that is not a positive match, is it?

A. No. There's really no way that you can take a hair and say that it came from one individual and one individual only unless you have some really unique characteristics, which would maybe say like a female who would dye her hair one color and then the next day dye it a different color, then you would end up with two or three different dye lines that could be measured from the root. When you're dealing with undyed hair, the best that you can do is say it is consistent with, based upon the microscopic analysis of that hair, the questioned hair and the suspect of comparison hair.

Q When you found the pubic hair type and blood type were consistent, are these two things that go together would you expect when you see the one you would see the other?

A. No sir. They are independent factors.

Q. So the fact that he has similar blood does not mean that he has similar pubic hair or vice versa?

A. That is correct. Each test should be taken as an independent test.

N.T., 2/3/1987, at 229-30.

Ermlick also testified regarding various synthetic fibers found on the victim. As this Court explained in its opinion on direct appeal,

> [Tedford]'s ski sweater, removed from [his] car pursuant to a search to which he consented was introduced into evidence. Red synthetic fibers removed from the victim's blouse and red synthetic fibers removed from [Tedford]'s ski sweater were found to have the same microscopic characteristics. The ultimate source of those fibers could not be determined. Certain polyprophyrin fibers obtained from the victim's jacket and from carpet backing from The Finishing Touch were microscopically examined and it was determined that they matched. Certain vegetable fibers found on the victim's clothing were microscopically examined and compared with vegetable fibers taken from The Finishing Touch and it was determined that they were similar. The clothing of the victim was loaded with lint and was not in a condition that you would expect a person to wear. The victim's house and wardrobe were examined and it was determined that the fibers found on her clothing could not have come from her home or wardrobe. Pennsylvania State Police Criminalist Scott Ermlick testified that it is unusual to find three different types of foreign fibers on a victim's clothing. He testified that, contrary to popular belief, it is not very common to find a cross transfer of fibers and hairs.

*Tedford*, 567 A.2d at 616.

Tedford, testifying on his own behalf, stated that he met Revak in late October or early November, 1985 when she came to The Finishing Touch in search of a job. Tedford stated that he and Revak formed a friendship and that she would stop by the store once or twice a week. According to Tedford, he and Revak eventually developed a close intimate relationship and that once a week they would have sexual intercourse on the floor of his office at The Finishing Touch. Tedford testified that just before noon on Friday, January 10, 1986, Revak unexpectedly walked into The Finishing Touch store to see him. He testified that shortly after Revak arrived, a delivery man made a delivery to the store, and that soon thereafter he and Revak went into his office, where the victim

disrobed and they had sexual intercourse on a mat he placed on the floor. According to Tedford, after he and Revak had consensual sex, she dressed and left the store, having spent no more than thirty to forty-five minutes at The Finishing Touch. He said that he did not see or hear from her again.

The jury returned a verdict of guilty on the first-degree murder and rape charges.[2] In the penalty phase of the trial, Tedford presented no mitigation evidence. The jury found two aggravating circumstances[3] and no mitigating circumstances and returned a sentence of death. The trial court sentenced Tedford to death for first-degree murder and a consecutive term of imprisonment of eight and a half to seventeen years for rape. After being appointed new counsel, Tedford was permitted to file post-sentence motions nunc pro tunc. He did so, raising multiple issues of trial court error and over eighty claims of trial counsel ineffectiveness, including trial counsel's alleged failure to investigate and call witnesses, recall certain prosecution witnesses, impeach prosecution witnesses, present scientific evidence, challenge the prosecution's forensic evidence, and present evidence in support of mitigating circumstances. *See Tedford*, 960 A.2d at 10. On April 29, 1988, the trial court, after a hearing, denied all of Tedford's post-sentence motions. On direct appeal, this Court affirmed the conviction and judgment of sentence. *Commonwealth v. Tedford*, 567 A.2d 610, 611-12 (Pa. 1989).

---

[2]  18 Pa.C.S. §§ 3121(a), 2502(a).

[3]  42 Pa.C.S. §§ 9711(d)(6) ("The defendant committed a killing while in the perpetration of a felony); 9711(d)(9) ("The defendant has a significant history of felony convictions involving the use or threat of violence to the person").

Tedford filed a pro se PCRA petition on July 12, 1995[4] and new counsel was appointed. A counseled PCRA petition on January 15, 1997. He asserted claims for, inter alia, the ineffectiveness of direct appellate counsel for failing to investigate and raise trial counsel's ineffective performance in the manner in which he preserved and developed a claim concerning alleged juror knowledge of appellant's prior convictions; the ineffectiveness of appellate counsel in investigating and correcting trial transcript alterations and deletions; the ineffectiveness of trial counsel to investigate and develop various evidentiary issues (including challenges to the evidence supporting the rape conviction); that post-trial and appellate counsel had a conflict of interest; and that the prosecution had suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

In the course of litigating his first PCRA petition, Tedford filed various motions for discovery. Among other things, he requested materials that were not contained in his trial counsel's file but that he believed existed, such as photographs taken during the investigation, crime scene drawings, audiotapes of witness interviews, UPS delivery logs, all property seized from him, and polygraph reports. The PCRA court reviewed each request and determined that Tedford failed to show good cause to justify granting

_____

[4] On August 2, 1995, the PCRA court entered an order dismissing the pro se PCRA petition without prejudice and directed Tedford to file a counseled petition. He did so on January 15, 1996, but on January 28, 2000 the PCRA court dismissed it as untimely, reasoning that it was his second PCRA petition and was not filed within one year of the date his judgment of sentence became final. On appeal, this Court reversed the PCRA court and remanded the case for consideration of the merits of the claims raised in Tedford's January 15, 1997 petition. *Commonwealth v. Tedford*, 781 A.2d 1167 (Pa. 2001). The Court ruled that the January 15, 1996 petition was merely an amendment to his July 12, 1995 petition, and thus was not a second petition. *Commonwealth v. Tedford*, 566 457, 781 A.2d 1167 (Pa. 2001).

discovery. Memorandum Opinion and Order, 6/12/2002. This Court affirmed, indicating that the discovery requests were "overbroad, improper, and lacking in good cause." *Tedford*, 960 A.2d 1, 30 (Pa. 2008). On March 5, 2004, by memorandum opinion and order the PCRA court dismissed all of Tedford's PCRA claims except for the claim that his post-trial and appellate counsel had labored under a conflict of interest. The PCRA court held an evidentiary hearing on May 18, 2004 limited to that remaining claim, and on July 16, 2004 it issued a second memorandum opinion and order denying the claim. This Court affirmed those rulings on appeal. *Tedford*, 960 A.2d at 55.

Tedford filed a counseled petition for writ of habeas corpus in the United States District Court for the Western District of Pennsylvania, alleging that his judgment of sentence violated his federal constitutional rights. Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. 2254, 11/18/2009, at 93. He asserted eighteen claims for relief, including those raised in his first PCRA petition, asserting that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated because of prosecutorial suppression and manipulation of evidence; that the Commonwealth withheld material, exculpatory evidence regarding plea deals it had with certain witnesses; that the prosecutor committed misconduct during opening and closing arguments; that his appellate attorney labored under a conflict of interest that adversely affected his performance and deprived Tedford of the effective assistance of counsel; and that trial counsel was ineffective in failing to investigate and present available mitigating evidence. *Id.* In his prayers for relief, he asked the district court to grant discovery; to conduct an evidentiary hearing; and, ultimately to vacate his convictions and death sentence. *Id.*

In connection with his habeas filing, Tedford filed a motion for discovery seeking precisely the same categories of documents and other materials he had requested in connection with his first PCRA petition. The federal district court denied all but one of Tedford's document requests. *Tedford v. Beard*, 2010 WL 3885207, *1 (W.D. Pa. Sept. 28, 2010) (granting the request for "any previously undisclosed police reports regarding the 'further investigation' referenced in the affidavit of probable cause").

In January 2011, through counsel Tedford submitted a request to the Pennsylvania State Police ("PSP") under the Pennsylvania Right to Know Law ("RTKL"), 65 P.S. §§ 67.101-67.3104, for all documents relating to the investigation of the rape and murder of Revak. The PSP denied the request on the grounds that the production of criminal investigation materials is prohibited by the RTKL as well as Pennsylvania's Criminal History Record Information Act, 18 Pa.C.S. §§ 9101-9183. The PSP attached to its response an index listing the records in its possession subject to Tedford's RTKL request and the statutory provisions that barred disclosure of those records to him. Tedford's counsel did not appeal this decision to the Pennsylvania Office of Open Records, 65 P.S. § 67.1101, believing that the RTKL decision was in accordance with state law. N.T., 3/28/2011, at 40.

Instead, through counsel Tedford filed a second discovery motion in federal court to compel disclosure of the entire investigative file related to Revak's death, as described in the index the PSP attached to its response to his RTKL request. The district court denied the request, indicating that it was based only on a "bald and general allegation that a possibility exists that the [PSP] files might contain something of benefit to [him]" and that such an assertion "is insufficient to justify discovery in federal habeas." *Tedford*

*v. Beard*, 2014 WL 4828873, at *12 (Pa. Sept. 28, 2014). The court further explained that Tedford's request was based upon the faulty premise that he was entitled to the entire investigative file before trial. *Id.* ("[A] criminal defendant has no legal entitlement to review the prosecution's entire investigative file, either before, during, or after trial.") (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 59-60 (1987) ("A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files.")). Finally, the federal court noted that Tedford had not been sufficiently diligent in attempting to obtain the discovery in state court. *Id.* at *13 (citing Memorandum Opinion and Order, 6/30/2011, at 12).

In 2014, Tedford filed a third motion for discovery in the federal district court, identifying twenty categories of items that he contended should be produced. *Tedford v. Beard*, 2014 WL 4828873, at *13. The court denied this motion, observing that there was no basis to reconsider its prior determinations. *Id.* at *15-17. The district court subsequently stayed the federal habeas proceedings to permit Tedford to pursue state post-conviction proceedings, where he could seek additional discovery. Opinion and Order, 11/7/2014, at 5-6.

On December 2, 2014, Tedford, proceeding pro se, filed a second PCRA petition. He asserted various claims for relief, including that previous PCRA counsel had failed to take adequate efforts to obtain discovery and did not develop issues relating to trial counsel's failure to obtain pre-trial discovery; that PCRA counsel had failed to identify specific pieces of evidence for DNA testing; that the prosecution solicited and used perjured testimony at trial; that the trial court advised a witness not to exercise his Fifth Amendment rights; and that PCRA counsel did not develop issues relating to the

questionable collection, handling, and chain of custody of evidence. In connection with his first claim regarding prior counsel's failure to obtain discovery, Tedford included in his pro se PCRA petition a lengthy request for discovery:

> All and any records, documents, reports, statements, audio-recordings, drafts and diagrams, photographs, photographic negatives, clothing and shoes, blood and hair samples, rape kit, fibers, lab reports, records and drawings, pathologist's records, files and audio-recordings, all polygraph examinations, and all and any other evidence in the possession of state prosecuting authorities, State Police, Cranberry Township Police, and any other police agency or office, and including but not limited to the 823 pages of records, documents and materials relating to this case which are not in the possession of Pennsylvania State Police.

PCRA Petition, 12/2/2014, at 6.

On January 8, 2015, the PCRA court appointed counsel to represent him and directed that an amended counseled petition be filed. On May 5, 2015, a counseled amended PCRA petition was in fact filed. It was titled as "Consolidated Pleadings" consisting of (1) an amended PCRA petition, (2) a petition for reconsideration of the PCRA court's memorandum opinion and order of June 12, 2002, rejecting his discovery requests in connection with his first PCRA petition, (3) a petition for writ of habeas corpus, (4) a petition for relief pursuant to Article I, Section 11 of the Pennsylvania Constitution, and (5) a motion for DNA testing. In this petition, Tedford forthrightly admitted in its introductory paragraph that his purpose in filing is to obtain all of the discovery that had been denied to him in connection with his previous PCRA petition and his federal habeas petition:

> The primary focus of the matters now brought before this Honorable Court is the critical issue of the lack of proper discovery in the above case that has so distorted the rulings of the trial, PCRA, appellate, and federal habeas corpus

courts in this matter from virtually the outset of the case. As will be demonstrated herein, the issue of discovery has been essentially dismissed by the courts based on the belief that trial counsel received everything that he could have possibly received in the proper exercise of the discovery roles as they apply to a capital prosecution in the Commonwealth. That belief, however, was undermined by [the] March 4, 2011, acknowledgement from the [PSP] that what has been revealed to Tedford about this case represents only about 45% of the materials gathered by the investigating agencies in connection of this matter. That revelation should compel this Court to revisit the issues of discovery which are inextricably intertwined with the serious allegations Tedford has made about the failures of his trial, appellate and PCRA counsel and his claims that material exists that should otherwise be disclosed.

Consolidated PCRA Pleadings, 1/8/2015, ¶ A.

In seeking this discovery, Tedford effectively acknowledged that discovery is unavailable in the absence of an underlying action in a court, as he stated that in order to "engage in the critical re-examination of discovery" here, he must "propose to the Court an appropriate form of action in which that inquiry should be accomplished. Id. ¶ B. Accordingly, his second PCRA petition asserted claims based upon (1) the ineffectiveness of trial counsel to invoke the discovery process properly at trial, (2) the ineffectiveness of trial counsel to otherwise adequately and effectively develop the facts necessary to present a proper defense, (3) the failure of PCRA counsel to properly obtain discovery pursuant to Rule 902(E)(2) by failing to file a properly focused motion to establish good cause for the grant of that relief and by failing to uncover the existence of a huge amount of undisclosed material relating to the case and still in possession of the Commonwealth. Consolidated Pleadings, 5/5/2015, ¶ D(iv). In addition, and in an implicit recognition that his second PCRA petition was not timely filed, he also recommended four "end arounds" to the need to assert a timely and legally cognizable

claim under the PCRA. Specifically, he contended that his new filing could be considered to be a motion to reconsider the denial of discovery in connection with his first PCRA petition, noting that the prior PCRA court did not know that the Commonwealth had withheld from him a majority of the investigative materials in the PSP's files. *Id.*, ¶ E. Alternatively, his new filing could be treated as a petition for habeas relief pursuant to 42 Pa.C.S. § 6501, *id.*, ¶ F, or as a request for relief pursuant to the "Remedies Clause" in Article I, Section 11 of our state Constitution, *id.*, ¶ G. Finally, he requested DNA testing. *Id.*, H.

In these "Consolidated Pleadings," Tedford reiterated his demand that the Commonwealth produce all of the documents in the PSP's possession regarding the Revak investigation, as identified on the index attached to the RTKL response. He argued that the Commonwealth had previously represented to his trial counsel that it had disclosed all available materials, but that in response to his RTKL request the PSP indicated that it possessed 823 pages of materials. *Id.* at ¶¶ 27-28. Claiming that the Commonwealth had only disclosed 375 to him, he insisted that the Commonwealth had failed to disclose to him 478 pages relating to the Revak investigation and that he was entitled to discovery of these documents. Id. at ¶¶ 109-208.

On June 9, 2015, Tedford filed another PCRA petition, styled as a "supplemental petition," in which he claimed an entitlement to relief based upon an April 20, 2015 press release issued by the Federal Bureau of Investigation ("FBI"), in which the FBI admitted, for the first time, that testimony provided by its analysts (and other analysts that it trained) regarding microscopic hair comparative analysis was erroneous in the vast majority of cases. Tedford argued that this press release constituted a newly discovered fact for

purposes of the Section 9545(b)(1)(ii) exception to the PCRA's one-year time bar. In his supplemental PCRA petition, Tedford alleged that Ermlick had been trained by the FBI and utilized its now discredited techniques in connection with his expert scientific testimony at trial.[5] Tedford's Supplemental PCRA Petition, 6/9/2015, ¶ 8. He sought discovery related to Ermlick's testimony, an evidentiary hearing, and the vacation of his judgment of sentence. *Id.* ¶¶ 21, 23, 27.

Approximately three years later, the Commonwealth filed a response. Commonwealth's Response, 9/18/2018. With regard to Tedford's broad request for discovery in connection with his amended counseled second PCRA petition, the Commonwealth argued that the PCRA court lacked jurisdiction and authority to entertain the request because the petition was not timely filed. *Id.*, ¶ 13. With regard to Tedford's supplemental petition, the Commonwealth agreed that the PCRA court had jurisdiction to consider the merits of his claim, based upon this Court's decision in *Commonwealth v. Chmiel*, 173 A.3d 617 (Pa. 2017), in which we ruled that the FBI 2015 press release constituted an newly discovered fact for purposes of the timeliness exception in Section 9545(b)(1)(ii). *Id.* at 626. Nevertheless, the Commonwealth argued that Tedford's underlying claim was without merit. *Id.*, ¶ 40. The Commonwealth claimed that the April 20, 2015 press release did not invalidate microscopic hair analysis entirely, but rather merely acknowledged a high degree of "overclaiming" by its analysts – overstating the extent to which the comparative analysis of hairs could identify the origin of a hair as belonging a particular person. *Id.*, ¶ 42. In this regard, the Commonwealth insisted that

---

[5] He also asserted that his trial counsel was ineffective for failing to challenge the admission of Ermlick's testimony, a claim that he does not advance on appeal. *Id.* at 6.

Ermlick's testimony did not involve any overclaiming, as he only testified that the pubic hair found on Revak's body was "consistent with" Tedford's pubic hair, rather than testifying the it "belonged to" Tedford. *Id.* at 47.

The PCRA court filed notice of its intention to dismiss all of the claims without an evidentiary hearing, setting forth its reasons for dismissal pursuant to Pa.R.Crim.P. 909(B).[6] PCRA Court Notice of Intentional to Dismiss pursuant to Pa.R.Crim.P. 909(B), 10/9/2018, 2-8. As to the request for discovery, the PCRA court understood Tedford to be relying on the newly discovered facts exception in Section 9545(b)(1)(ii),[7] with the

---

[6] According to Pennsylvania Rule of Criminal Procedure 909(B)(2), "[i]f the judge is satisfied from this review that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceedings, (a) the judge shall give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal." Pa.R.Crim.P. 909(B)(2)(a). The Petitioner may respond to the proposed dismissal within twenty days of the notice of intent to dismiss. Pa.R.Crim.P. 909(B)(2)(b).

[7] Prior to 2018, the PCRA's timeliness provisions provided, in relevant part:

(b) Time for filing petition.–

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the

newly discovered fact being the PSP's disclosure that it had not, contrary to prior representations, produced to him all of the relevant documents in its possession regarding the Revak investigation. *Id.* at 4-7. The PCRA court rejected this contention, as Tedford had not filed the PCRA petition within sixty days of the date on the claim could have been presented (March 4, 2011, the date on which he received the PSP's letter denying his RTKL request).[8] *Id.* at 6. It also stated that Tedford could not raise his claim because it was previously litigated and because he waived his claim when he failed to pursue an appeal of the RTKL response with the Office of Open Records. *Id.* at 6 (citing 42 Pa.C.S. § 9544(a) and (b)). With regard to Tedford's challenge to Ermlick's testimony regarding microscopic hair analysis testimony, the PCRA court held that jurisdiction was lacking and that the press release did not constitute exculpatory evidence that would have changed the outcome of trial. *Id.* at 7-8.

Tedford filed a response to the Rule 909(B) notice, asserting that the PCRA court had jurisdiction over his amended counseled petition. He claimed that counsel

---

United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.

42 Pa.C.S. § 9545(b) (eff. Jan. 16, 1996 to Dec. 24, 2018). Section 9545(b)(2) was amended in 2018 to provide that "[a]ny petition invoking an exception provided in paragraph (1) shall be filed within one year of the date the claim could have been presented."

[8] Prior to the effective date of this 2018 amendment, Section 9545(b)(2) provided that "[a]ny petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented." Because Tedford's claim arose well before the amendment to Section 9545(b)(2), the older version of the statute applies.

representing him at the time of his first PCRA petition were ineffective for failing to properly advance and articulate his discovery request. Response to PCRA Court's Notice of Intention to Dismiss, 10/29/2018, at 11, 23-25. As such, he argued that because he had a right to constitutionally effective counsel in his collateral relief efforts, the PCRA time bar was unconstitutional as applied to him. *Id.* at 10-11. With respect to his supplemental petition, he argued that *Chmiel* provided jurisdiction to consider this petition.

On February 11, 2019, the PCRA court issued an order, again indicating its lack of jurisdiction to hear the untimely PCRA requests regarding discovery matters. PCRA Court Order, 2/11/2019, at 1. Based upon *Chmiel*, it corrected its previous ruling regarding jurisdiction over the supplemental petition, but continued to maintain, for the reasons set forth in the Rule 909(B) notice, that Tedford's microscopic hair analysis claim lacked any merit. *Id.* at 2.[9]

Tedford filed a timely counseled notice of appeal. In this Court, Tedford raises three issues for our consideration:

1. Whether the [t]rial [c]ourt erred in concluding it lacked jurisdiction to consider Tedford's PCRA pleading because it was allegedly filed outside the statute of limitations provided by Title 42 Pa.C.S. §9545(b) when proper jurisdiction was conferred on the Court from each of the following alternative bases:

    a) the petition was timely pursuant to Title 42 Pa.C.S. §9545(b)(ii) as it was based on a new

---

[9] The PCRA court granted Tedford leave to file an amended motion requesting leave for DNA testing in conformity with 42 Pa.C.S. § 9543.1 within sixty days. PCRA Court Order, 2/11/2019, at 2-3. Tedford did not file an amended motion for DNA testing and does not raise any arguments related to DNA testing before this Court.

fact that permitted a filing outside the statute of limitations;

b) the petition properly sought reconsideration of the previous, timely filed PCRA application because the dismissal of that prior application was based on a material error of fact that required reconsideration; and,

c) the application of the statute of limitations violates Tedford's rights to due process pursuant to the 5th and 14th Amendments to the United States Constitution and Article 1, §9 of the Constitution of the Commonwealth, and his right to a judicial remedy pursuant to Article 1, §11 of the Constitution of the Commonwealth?

2. Whether the [t]rial [c]ourt erred in dismissing the case where the Commonwealth conceded it was amenable to discovery and the only remaining issue was the precise method through which discovery would be provided?

3. Whether the [t]rial [c]ourt erred in denying Tedford a new trial without providing him discovery and an evidentiary hearing where newly discovered evidence established critical expert trial testimony regarding hair and fiber analysis lacked a scientific basis and was unreliable?

Telford's Brief at 5.

In *Commonwealth v. Spotz*, 84 A.3d 294 (Pa. 2014), this Court articulated an appellate court's scope and standard of review of a denial of PCRA relief as follows:

[A]n appellate court reviews the PCRA court's findings of fact to determine whether they are supported by the record, and reviews its conclusions of law to determine whether they are free from legal error. The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level.

*Id.* at 311 (quotation marks and citations omitted).

## I.     PCRA court's jurisdiction over requests for discovery of PSP files

For his first claim, Tedford asserts that the PCRA court erred in dismissing his second counseled PCRA petition as untimely.  This Court has consistently held that the PCRA's time restrictions are jurisdictional in nature and that a PCRA court must, before considering the merits of claims asserted in a PCRA petition, first make a threshold determination whether each claim was timely filed.  *See, e.g., Commonwealth v. Cox*, 146 A.3d 221, 227 (Pa. 2016); *Commonwealth v. Robinson*, 139 A.3d 178, 185-186 (Pa. 2016); *Commonwealth v. Taylor*, 67 A.3d 1245, 1248-1249 (Pa. 2013).

In the vast majority of cases, if a PCRA claim is not timely filed, the PCRA court must dismiss it.[10]  *See, e.g., Commonwealth v. Jones*, 54 A.3d 14, 18 (Pa. 2012); *Taylor*, 67 A.3d at 1249.  Section 9545(b) of the PCRA establishes a one-year time bar for the filing of PCRA claims, with three exceptions.  We summarized the statutory language of Section 9545(b) in *Jones* as follows:

> A PCRA petition, including a second or subsequent one, must be filed within one year of the date the petitioner's judgment of sentence became final, unless he pleads and proves one of the three exceptions outlined in 42 Pa.C.S. § 9545(b)(1).  A judgment becomes final at the conclusion of direct review by this Court or the United States Supreme Court, or at the expiration of the time for seeking such review.

---

[10]  We decline Tedford's invitation to treat his second PCRA petition as a petition for habeas relief pursuant to 42 Pa.C.S. § 6501.  If a petitioner's claim falls under the parameters of the PCRA, it must be litigated under the PCRA statute.  *Commonwealth v. Descardes*, 136 A.3d 493, 501-503 (Pa. 2016) ("[W]here a petitioner's claim is cognizable under the PCRA, the PCRA is the only method of obtaining collateral review.").  The PCRA governs seven types of enumerated errors as set forth in 42 Pa.C.S. § 9543(a)(2).  These include violations of the state and federal constitutions, 42 Pa.C.S. § 9543(a)(2)(i), ineffective assistance of counsel, 42 Pa.C.S. § 9543(a)(2)(ii), and after-discovered evidence that would have changed the outcome of trial, 42 Pa.C.S. § 9543(a)(2)(vi).  As such, all of the claims in Tedford's second PCRA petition are cognizable under the PCRA statute and must be litigated under PCRA strictures, including its timeliness requirements.

> … The PCRA squarely places upon the petitioner the burden of proving an untimely petition fits within one of the three exceptions. The PCRA further requires a petition invoking one of these exceptions to be filed within 60 days of the date the claim could have been presented.

*Jones*, 54 A.3d at 16-17 (citations and footnote omitted).

In this case, this Court affirmed Tedford's March 20, 1987 judgment on December 13, 1989 and his judgment of sentence became final ninety days thereafter. The one-year time bar began to run on the date that the 1995 legislative amendments to the PCRA statute became effective (January 16, 1996). As a result, the one-year limitations period for filing a PCRA expired on January 16, 1997. *Tedford*, 960 A.2d at 11. Therefore, for the PCRA court to have jurisdiction to consider Tedford's second PCRA petition, he was required to plead and prove one of the three enumerated exceptions to the time bar. Tedford contends that he was entitled to file his current PCRA petition based upon the newly discovered facts exception, which provides that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." 42 Pa.C.S. § 9545(b)(1)(ii). He argues that the "facts" which permitted the filing of his present PCRA petition include the "revelations" in the PSP's March 4, 2011 letter in response to his RTKL request. Tedford's Brief at 46-47. In particular, he posits that prior to receipt of this letter, he had from the time of trial been assured by the Commonwealth that the 375 pages of documents that he had received in discovery was the sum total of the documents available for discovery. *Id.* at 44, 60. The March 4, 2011 letter and attachment, however, revealed that the PSP had more than 800 documents in its possession, demonstrating that Tedford had received only about 40 to 45% of the PSP's files. *Id.* at 42.

Tedford does not deny that he failed to file his current PCRA petition within sixty days of receipt of the PSP's March 4, 2011 letter. Indeed, he did not file his current PCRA petition until December 2, 2014, well over three years after the receipt of the PSP's letter. Tedford argues, however, that this lapse in time should be excused, as it was the result of his prior counsel's ineffectiveness. He posits that upon receipt of the PSP's letter, his prior counsel should have immediately filed (i.e., within sixty days) a new PCRA petition. *Id.* at 46-47. The PCRA court rejected this argument, pointing out that Tedford's focus on the ineffectiveness of "prior counsel" was misguided, since his present counsel was appointed to represent him in his federal court habeas proceedings on September 11, 2012. Order of Court Pursuant to Pa.R.A.P. 1925(a), 4/12/2019, at 14 (citing *Tedford,* 2014 WL 4828873, at *13). As such, Tedford did not file the current PCRA petition until more than two years after new counsel was appointed (following the denial of his discovery requests in the federal district court). *Id.*

Tedford's contention, namely that the requirement that a PCRA claim based upon the newly discovered facts exception in Section 9545(b)(1)(ii) must be filed within sixty days from the date on which it could have been presented "did not apply to him" because of his prior counsel's ineffectiveness, overlooks that this Court has repeatedly held that claims of ineffectiveness do not overcome the statutory time limitations of the PCRA statute. In *Commonwealth v. Gamboa-Taylor*, 753 A.2d 780, 786 (Pa. 2000), for example, we stated that "claims of PCRA counsel's ineffectiveness do not escape the PCRA one-year time limitation merely because they are presented in terms of current counsel's discovery of the 'fact' that a previous attorney was ineffective." *Id.* at 786. More recently, in *Commonwealth v. Robinson*, 139 A.3d 178 (Pa. 2016), we observed

that "it is well-settled that couching a petitioner's claims in terms of ineffectiveness will not save an otherwise untimely filed petition from the application of the time restrictions of the PCRA." *Id.* at 186. We have also consistently held that courts have no power to carve out equitable extensions to the PCRA's timeliness requirements. *See, e.g., Robinson,* 139 A.3d at 180, 187*; Commonwealth v. Cruz,* 852 A.2d 287, 292 (Pa. 2004)*; Commonwealth v. Robinson,* 837 A.2d 1157, 1161 (Pa. 2003)*; Commonwealth v. Fahy,* 737 A.2d 214, 222 (Pa. 1999).

In an effort to avoid these rulings by this Court, Tedford cites to *Commonwealth v. Peterson*, 192 A.3d 1123 (Pa. 2018), in which this Court held that counsel's negligence per se in filing an untimely PCRA petition constitutes adequate grounds to permit the filing of a new PCRA petition beyond the one-year time bar pursuant to the exception in subsection 9545(b)(1)(ii). *Id.* at 1125. *Peterson* involved a unique procedural context. After being sentenced to consecutive life sentences for first-degree murder, Peterson petitioned for post-conviction relief. Although the docket reflected that an evidentiary hearing was scheduled, it never took place and there was no further activity on the petition for the next fifteen years. The PCRA court denied the petition on its merits, but on appeal the Superior Court quashed the appeal because it had been filed one day too late under the PCRA's timeliness requirements. Peterson then filed a second petition, seeking, based upon counsel's ineffectiveness in filing his first PCRA petition late, reinstatement of his PCRA appellate rights nunc pro tunc to challenge the PCRA court's order dismissing his first petition. This Court reversed the Superior Court's quashal of the second petition on timeliness grounds, ruling that counsel's untimely filing of Peterson's first PCRA petition constituted ineffectiveness per se, "as it completely

deprived Peterson of any consideration of his collateral claims under the PCRA." *Id.* at 1130. Counsel's ineffectiveness per se in connection with Peterson's first PCRA petition was a newly discovered "fact" under Section 9545(b)(2)(iii), as the PCRA court had made factual findings that Peterson did not know about the untimely filing and could not have ascertained this fact through the exercise of due diligence. *Id.* at 1130-31. Given these factual findings, and because counsel's untimely filing of Peterson's first PCRA petition constituted ineffectiveness per se by completely foreclosing him from obtaining any collateral review, we concluded that Peterson was entitled to invoke the subsection 9545(b)(1)(ii) exception to permit the filing of his second PCRA petition beyond the one-year time bar. *Id.* at 1132.

Tedford argues that his prior counsel's failure to timely file a new PCRA petition within sixty days of receipt of the PSP's letter constituted negligence per se. Tedford's Brief at 48. We disagree, as even if we assume that prior counsel's (and current counsel's) actions constituted ineffective assistance of counsel, said ineffectiveness was not ineffectiveness per se, as it did not wholly deprive Tedford of collateral PCRA review. As the PCRA court correctly observed, Tedford previously litigated a substantial number of collateral claims in connection with his first PCRA petition, including multiple claims of ineffective assistance by trial and appellate counsel and numerous contentions that he had been improperly denied discovery. Order of Court Pursuant to Pa.R.A.P. 1925(a), 4/12/2019, at 17. This Court thoroughly reviewed the certified record and affirmed the PCRA's denial of those claims. *Tedford*, 960 A.2d at 56. Moreover, any ineffectiveness by counsel (past or present) has not jurisdictionally foreclosed all of Tedford's current

collateral claims, as the PCRA court considered his microscopic hair analysis and DNA testing on their merits.

Next, Tedford argues that if his current PCRA petition is untimely under the strictures of Section 9545(b), then this provision of the PCRA is "unconstitutional as applied." Tedford's Brief at 56-59. Again invoking the ineffectiveness of his prior counsel, he contends that he has a constitutional right to "receive a fair hearing in connection with his claims and the effective assistance of counsel pursuant to the 5th, 6th and 14th Amendments to the United States Constitution and Article I §9 of the Constitution." *Id.* at 56 (citing *Commonwealth v. Smith*, 121 A.3d 1049, 1053 (Pa. Super. 2014)). In this regard, he insists that "[h]is substantive right to seek relief and to a fair procedure [has been] summarily repudiated by the mechanical operation of the statute of limitations." *Id.* at 58. He further argues that Article 1, Section 11, sometimes known as the "Remedies Clause," entitles him to relief from the ineffectiveness per se of his prior counsel, as that constitutional provision "ensures that where legal injury has been sustained there will always be some way for the individual to access the courts for relief." *Id.*

In his brief filed with this Court, Tedford makes no attempt to develop these constitutional arguments. We note that this Court has rejected prior constitutional challenges to the PCRA's timeliness provisions. In *Commonwealth v. Turner*, 80 A.3d 754, 767 (Pa. 2013), we held that the PCRA "provide[s] a reasonable opportunity for those who have been wrongly convicted to demonstrate the injustice of their conviction," and that "[t]he current PCRA places time limitations on such claims of error, and in so doing, strikes a reasonable balance between society's need for finality in criminal cases

and the convicted person's need to demonstrate that there has been an error in the proceedings that resulted in conviction." *Id.* at 767 (quoting *Commonwealth v. Peterkin*, 722 A.2d 638 (Pa. 1998)). Tedford does not address our reasoning in *Turner* and *Peterkin*.

Finally, Tedford posits that the PCRA court had jurisdiction to consider his present PCRA counseled petition as a reconsideration of his first petition, which was indisputably timely filed. Tedford's Brief at 51. He points to cases holding that Pennsylvania courts may reconsider a prior decision when it finds that its original ruling was based upon a "materially false factual premise." *Id.* at 52 (citing *Moore v. Moore*, 634 A.2d 163, 166 (Pa. 1991); *Nixon v. Nixon*, 198 A. 154, 158-59 (Pa. 1938)). Tedford claims that his collateral claims that counsel was ineffective in obtaining adequate discovery were rejected because the Commonwealth denied that anything remained to be discovered, and that, as a result, the PCRA court's January 31, 2000 order denying discovery should be vacated and his second PCRA petition should be considered as an amendment to the first. *Id.* at 51-53.

Tedford does not cite to any authority for his proposal. The Commonwealth cites to a case from this Court that rejected a similar request. In *Commonwealth v. Wholaver*, 177 A.3d 136 (Pa. 2018), the PCRA petitioner moved this Court to remand his case to the PCRA court so that he could amend his petition to add an additional claim based on an allegation of newly discovered facts. The PCRA petition had been filed seven years earlier and decided three years earlier by the PCRA court. This Court denied the request, stating:

> Appellant is attempting to amend his PCRA petition to include a claim of after-discovered evidence. Appellant fails to cite

any authority that would allow him to amend the petition decided herein at this late stage of litigation. Accordingly, we deny Appellant's motion for remand without prejudice to Appellant to attempt to raise his after-discovered-evidence claim in a serial PCRA petition.

*Id.* at 181.

In accordance with *Wholaver*, where a petitioner contends to have identified newly discovered facts, the proper approach under the PCRA is to file a new PCRA claim in accordance with Section 9545(b)(1)(ii). The PCRA court's January 31, 2000 order was entered twenty years ago and was subsequently affirmed by this Court twelve years ago. *Tedford*, 960 A.2d at 1. The PCRA court's denial of Tedford's request for "reconsideration"' of its prior order was free from legal error.

## II. The PCRA court did not err in dismissing the PCRA petition rather than agree to a precise method through which discovery would be provided

For his second issue on appeal, Tedford contends that, without regard to the strictures of the PCRA, the Commonwealth should have produced to him its entire file (as itemized on the attachment to the PSP's March 4, 2011 letter). Tedford contends that the Commonwealth's production of only 375 of the more than 800 documents in its possession violated discovery rules, including the current Rule 573 of the Pennsylvania Rules of Criminal Procedure. He argues that he is entitled to production of the entire prosecution file so that he may determine whether the Commonwealth has committed any *Brady*[11] violations. He notes that the itemized list of documents includes various reports identified as "crime report," "interviews," "medical information," "suspect

---

[11] A "*Brady* violation" consists of three elements: (1) suppression by the prosecution (2) of evidence, whether exculpatory or impeaching, favorable to the defendant, (3) to the prejudice of the defendant. *See, e.g.*, *Commonwealth v. Paddy*, 800 A.2d 294, 305 (Pa. 2002).

information," and "psychiatric reports," among others. He insists that these categories alone "strongly suggests the presence of *Brady* material within them," and asks whether "can anyone assert with confidence that Brady has been followed here," particularly given the Commonwealth's previous failure to disclose that it possessed documents that it had not produced to him. Tedford's Brief at 43, 62. Tedford states that he offered the Commonwealth and the PCRA court a review process whereby the Commonwealth would submit a list of documents for which it would assert a claim of privilege and the PCRA court would review the remaining documents in camera. *Id.* at 60. He argues that the PCRA court erred by rejecting his proposal and dismissing his PCRA petition as untimely. *Id.* at 65-66.

In *Commonwealth v. Williams*, 86 A.3d 771 (Pa. 2014), this Court articulated the discovery procedures that apply in PCRA cases. We specifically rejected any contention that a petitioner is entitled to review every document in the prosecutor's filed, regardless of whether the petitioner has asserted a *Brady* claim:

> By way of PCRA discovery background, it is important to reemphasize that, although substantive *Brady* claims may be cognizable under the PCRA, *Brady* does not govern the question of the scope of discovery under the PCRA. *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. at 68–69, 129 S.Ct. 2308 [2009]. Furthermore, the Commonwealth is correct that there is no general right, under *Brady* and our Criminal Rules as a trial matter, or under Rule 902(E)(2) as a capital PCRA matter, to inspect the prosecutor's file. *Brady* imposes an affirmative and continuing duty upon the government to disclose exculpatory information, but it establishes no specific right in the defendant to review the Commonwealth's file to see, for example, if he agrees with the Commonwealth's assessment and representation.

*    *    *

This Court elaborated upon the limitations of *Brady* in the capital PCRA context in *Williams, supra*:

> Nor would *Brady v. Maryland* have required the PCRA court to enter a specific order directing the production of exculpatory documents from the Commonwealth. While the Commonwealth's obligations under *Brady* continue through all stages of the judicial process, *see Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987), the Commonwealth is, in the first instance, the judge of what information must be disclosed. *See generally Commonwealth v. Copenhefer*, 553 Pa. 285, 319, 719 A.2d 242, 259 (1998) (stating that it is the petitioner's burden to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution").

*Williams*, 732 A.2d 1167, 1175–76 (Pa. 1999); *see also Commonwealth v. Edmiston*, 851 A.2d 883, 887 n. 3 (2004).

Given this background, we may summarily reject appellee's argument that he has a right to PCRA discovery conferred by the commentary to Criminal Rule 573 merely because he has raised a *Brady* claim. This argument misperceives Rule 573 and its associated commentary, as well as the scope of *Brady*. Chapter 5 of the Criminal Rules governs "Pretrial Procedures in Court Cases," with Rule 573 specifically addressing "Pretrial Discovery and Inspection." Rule 573(B)(2)(a) provides that, upon a motion for pre-trial discovery, the court has discretion to order the Commonwealth to allow a defendant's attorney to inspect, copy, or photograph any evidence identified by the defendant that is material to the defense and where disclosure is in the interest of justice. The comment then clarifies that this rule applies "only to court cases." By comparison, the comment notes that *Brady* applies "to all cases, including court cases and summary cases." Pa.R.Crim.P. 573 cmt. The comment says nothing about PCRA discovery, much less an entitlement to discovery, or even about the scope of discovery in instances where *Brady* controls. The comment merely adverts to pre-trial *Brady* obligations in both summary and court cases, in a rule devoted to court cases. The comment does not address, much less alter the controlling

Rule 902(E)(2) parameters for, discovery in collateral attacks brought under the PCRA.

\* \* \*

Thus, although the Commonwealth has a continuing duty to disclose exculpatory evidence it discovers, appellee's right to PCRA discovery is governed by Rule 902(E)(2), not by *Brady*. This is not to say that a *Brady* claim raised on PCRA review may never warrant some form of discovery. *See Williams, supra*. A sufficient, specific PCRA factual proffer may be made and credited by the PCRA judge so as to, for example, convince the judge that the Commonwealth has not been candid about the content of its files, so that inspection, whether in camera or by the defense, is warranted. But, the mere fact that a claim sounds in *Brady* does not, on its own, create a special right to PCRA discovery.

\* \* \*

Notably, this Court has viewed overly broad discovery requests under Rule 902(E)(2) with suspicion. A general claim of necessity is insufficient. Instead, discovery requests in the PCRA setting must be accompanied by an explanation why the exculpatory information was unavailable to prior counsel and must identify specific documents or items that were not disclosed pre-trial or during the trial proceedings. *Williams*, 732 A.2d at 1175; *Commonwealth v. Carson*, 913 A.2d at 261 ("[A] PCRA petitioner is not entitled to discovery where he has not shown the existence of requested documents, as speculation that requested documents will uncover exculpatory evidence does not satisfy the requirements of Rule 902(E)(2).") (citations omitted).

*Williams*, 86 A.3d at 787-789.[12]

---

[12] In Tedford's federal habeas proceedings, the federal district court responded similarly, indicating that merely because the PSP file contains more records than were made available to petitioner's defense does not support the inference that the prosecution improperly suppressed information. *Tedford v. Beard*, 2014 WL 4828873, at \*12 (Pa. Sept. 28, 2014) ("As counsel well knows, such a bald and general allegation that a possibility exists that the PSP's files might contain something of benefit to Petitioner, without more, is insufficient to justify discovery in federal habeas."). The district court also cited to precedent from the United States Supreme Court holding that "[t]here is no

For these reasons, the trial court did not err in dismissing Tedford's PCRA petition rather than providing him with access to the entirety of the Commonwealth's files. Tedford's demand to review the Commonwealth's files did not identify "specific documents or items that were not disclosed pre-trial or during trial proceeds," *id.* at 789, but rather is comprised entirely of conjecture that damaging documents may exist in those files.

## III. Microscopic Hair Analysis Claim

For his final issue, Tedford asserts that the PCRA court erred in denying discovery, an evidentiary hearing, and relief in the form of a new trial with respect to his claim that Ermlick, the Commonwealth's expert criminology analyst, testified improperly as to the strength of the microscopic hair analysis at trial. Tedford's Brief at 66. The Commonwealth and PCRA court agreed with Tedford that the FBI's April 20, 2015 press release[13] which reported the initial findings of an ongoing investigation that scrutinized the testimony of FBI analysts concerning microscopic hair comparison analysis prior to 2000,[14] provided PCRA courts with jurisdiction to hear this claim. Based upon this

---

general constitutional right to discovery in a criminal case, and *Brady* did not create one. *Id.* (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 59-60 (1987) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)).

[13] See Commonwealth's response to Tedford's supplemental PCRA, 9/18/2018, at 40 ("The Commonwealth agrees with Tedford that the April 20, 2015 joint press release … regarding FBI microscopic hair comparison analysis satisfies the [newly] discovered fact exception to the one-year PCRA time bar to permit an otherwise untimely PCRA claim to be considered on the merits.").

[14] In or around 2000, mitochondrial DNA testing replaced microscopic analysis at the FBI. FBI 2015 Press Release, 4/15/2015, at 1 (stating that "[t]he review focuses on cases worked prior to 2000, when mitochondrial DNA testing on hair became routine at the FBI.").

investigation,[15] the FBI concluded that its examiners' testimony "in at least 90% of cases contained erroneous statements" and that its analysts "committed widespread, systematic error, grossly exaggerating the significance of their data under oath with the consequence of unfairly bolstering the prosecution's case." *Chmiel*, 193 A.3d at 621. In *Chmiel*, this Court ruled that the FBI 2015 press release constitutes a newly discovered fact for purposes of the section 9545(b)(1)(ii) exception to the PCRA's one-year time bar. *Id.* at 626.

Tedford seeks relief pursuant to Section 9543(a)(2)(vi) of the PCRA, which states as follows:

**§ 9543.  Eligibility for relief**

**(a) General rule.--**To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:

*       *       *

(2) That the conviction or sentence resulted from one or more of the following:

*       *       *

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

42 Pa.C.S. § 9543(a)(2)(vi).  To obtain relief under the PCRA on an after-discovered evidence claim, a Petitioner must demonstrate that the evidence:

(1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely

---

[15]  The FBI, the Department of Justice ("DOJ"), the National Association of Criminal Defense Lawyers, and the Innocence Project jointly participated in the study.

to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

*Commonwealth v. Small*, 189 A.3d 961, 969 (Pa. 2018); *Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008).

While recognizing that it possessed jurisdiction to consider Tedford's claim pursuant to *Chmiel*, the PCRA court, based on its review of the merits of the claim, denied it without granting discovery or an evidentiary hearing. In denying relief, the PCRA court explained that the FBI 2015 press release regarding microscopic hair comparison testimony pertains only to testimony in which experts "overclaimed" the strength of their scientific analysis. Citing to a DOJ publication, the PCRA court indicated that the FBI 2015 press release concluded that FBI trained analysts "overclaimed" by committing one of the following errors approximately 96% of the time when offering trial testimony:

> Error Type 1: The examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others.
>
> Error Type 2: The examiner assigned to the positive association a statistical weight or probability, or provided a likelihood that the questioned hair originated from a particular source, or rendered an opinion on the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair sample.
>
> Error Type 3: The examiner cited the number of cases or hair analyses worked in the lab and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual.

PCRA Court Opinion, 4/12/2019, at 26 (citing DOJ, 65 Forensic Science and Forensic Evidence I, at 6-7 (Jan. 2017)). While observing that Ermlick was trained by the FBI,

upon a review of his trial testimony in this case, the PCRA court determined that Ermlick's testimony "does not appear to contain the 'overclaiming' errors that form the basis of the [FBI 2015 press release]." *Id.* On that basis, the PCRA court decided that "[t]he revelations in the [FBI 2015 press release,] viewed together with Mr. Ermlick's trial testimony, do not constitute exculpatory evidence that would likely have changed the outcome of trial in this matter." *Id.* The PCRA court thus concluded that an "evidentiary hearing was unnecessary and relief was not warranted based on the testimony presented at trial." *Id.* at 27.

On appeal to this Court, the Commonwealth supports the PCRA court's analysis. The Commonwealth indicates that the FBI 2015 press release "revealed that FBI analysts' testimony and reports over a 20-year period contained erroneous statements" by "grossly exaggerating the significance of their data under oath, with the consequence of unfairly bolstering the prosecutions' case." Commonwealth's Brief at 64. The Commonwealth insists that Ermlick did not identify the pubic hair found on Revak's person as belonging to Tedford, but rather only that it was "consistent" with a pubic hair recovered from Tedford's person. *Id.* 69-71. The Commonwealth also emphasizes that Ermlick informed the jury how he conducted his testing (by looking at both hairs under the microscope simultaneously and locating similarities or differences), and told the jury that his analysis was subjective, in that no mathematical standards were utilized. Tedford's Brief at 71.

Tedford disagrees that Ermlick's testimony did not involve "overreaching," as it effectively identified him as the source of the pubic hair by conveying to the jury that it was "consistent" with his pubic hairs but not "consistent" with those of the other likely

sources (Revak and her husband). Tedford's Reply Brief at 34. In *Chmiel*, a majority of the justices held that the "FBI has now publicly repudiated the use of microscopic hair analysis to 'link a criminal defendant to a crime.'" *Chmiel*, 173 A.3d at 626. Tedford contends that the FBI 2015 press release "establishes that Ermlick's testimony was not a mere technicality of a rule or procedure but was an ominous and tangible component of the phenomenon of wrongful convictions of which all society has taken stark cognizance in the past several years." *Id.* at 36.

We need not address whether Ermlick's testimony constituted "overreaching," as on this record we conclude that Tedford has failed to demonstrate that Ermlick's hair comparison testimony prejudiced him. As indicated, to obtain a new trial the petitioner must demonstrate that the after-discovered evidence at issue "would likely result in a different verdict if a new trial were granted." *Small*, 189 A.3d at 969. At trial, Tedford testified that he and Revak had consensual sex at The Finishing Touch at around noon on January 10, 1986, the day of her murder. The uncontested presence of Tedford's seminal fluid on Revak's clothing, along with Tedford's testimony, establishes that sexual relations occurred, and the only issue for the jury was whether these relations were consensual (as Tedford testified) or whether Tedford raped her (which in turn resulted in her murder, as the Commonwealth contends). The presence of the pubic hair, even if it was "consistent" with Tedford's own pubic hairs, provides no insight whatsoever with regard to the consensual (or violent) nature of the encounter. Because both Tedford and the Commonwealth agreed that Tedford and Revak had sexual relations on the day of the murder, the presence of his pubic hair on her clothing is unremarkable. If a new trial

were granted, it is highly unlikely that the absence of expert hair comparison testimony would likely result in a different verdict.

In this regard, Tedford has never argued to the contrary. Instead, Tedford has argued that Ermlick's scientific testimony as a whole, including his opinions of the consistency of the **fiber** evidence, prejudiced him. Ermlick testified that red synthetic fibers removed from Revak's clothing and synthetic fibers on Tedford's ski sweater shared the same microscopic characteristics, and that fibers found on Revak's jacket were consistent with carpet and twine found at The Finishing Touch (and could not have come from her home or the location where her body was recovered). Tedford has repeatedly stressed the prosecutor's remark at the end of his closing argument that "what 'saved' the case for the prosecution was the hair and fiber evidence linking Tedford to Revak's murder." Tedford's Reply Brief at 38. In fact, at this point in his closing statement, the prosecutor did not even mention hair evidence,[16] as he instead informed the jury that "[w]hat saved this case was the wool clothing and also the apparent fact there were a lot of fibers in The Finishing Touch, and she somehow was in contact with them." N.T., 2/6/1987, at 717.

The FBI 2015 press release strictly limited its scope to expert testimony regarding **hair** comparison analysis and included no findings relating to fiber comparison analysis. As a result, only expert testimony regarding hair comparison analysis constitutes after-discovered evidence for purposes of the *Small* four-factor test. Limiting our focus to

---

[16] The prosecutor mentioned the pubic hair found on Revak's body only once in his closing argument. At the outset, the prosecutor indicated that the Commonwealth had presented a strong case of circumstantial evidence against Tedford, listing the "pubic hair on her underwear that matched his" as one of a number of items of circumstantial evidence. N.T., 2/6/1987, at 669.

Ermlick's expert testimony regarding the pubic hair on Revak's clothing, we cannot say that it so prejudiced Tedford that its absence at a new trial would result in a different outcome.

The order of the PCRA court is hereby affirmed.

Chief Justice Saylor and Justices Baer, Todd, Dougherty, Wecht and Mundy join the opinion.